**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Dayton Bar Assn. v. Baker*, **Slip Opinion No. 2026-Ohio-2673.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2673

DAYTON BAR ASSOCIATION *v.* BAKER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Dayton Bar Assn. v. Baker*, Slip Opinion No. 2026-Ohio-2673.]**

*Attorneys—Misconduct—Violation of the Rules of Professional Conduct, including engaging in conduct that involves dishonesty, fraud, deceit, or misrepresentation, is prejudicial to the administration of justice, and adversely reflects on practice of law—Two-year suspension with one year conditionally stayed.*

(No. 2025-0791—Submitted September 16, 2025—Decided July 15, 2026.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-029.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, GALLAGHER, HAWKINS, and SHANAHAN, JJ. DEWINE, J., concurred, with an opinion. DETERS, J., concurred in part and dissented in part and would impose a

one-year suspension with six months conditionally stayed as recommended by the Board of Professional Conduct. EILEEN T. GALLAGHER, J., of the Eighth District Court of Appeals, sat for BRUNNER, J.

**Per Curiam.**

{¶ 1} Respondent, Christine Marie Baker, of Dayton, Ohio, Attorney Registration No. 0088634, was admitted to the practice of law in Ohio in 2012. On December 17, 2014, we suspended Baker from the practice of law based on her failure to complete the new-lawyers training required by former Gov.Bar R. X(3)(C)(2)(a), her failure to timely file the final reporting transcript as required by former Gov.Bar R. X(3)(C)(2)(b), and her failure to rectify her noncompliance in accordance with former Gov.Bar R. X(6)(B). *See* 2014-Ohio-5542. We reinstated her to the practice of law on March 18, 2015. *See In re Continuing Legal Education Suspension of Baker*, 2015-Ohio-990.

{¶ 2} In a December 2024 amended complaint, relator, the Dayton Bar Association, alleged that Baker violated four professional-conduct rules arising from her efforts to recover two misdirected electronic-fund transfers and her subsequent commencement of civil litigation against the unintended recipient of the transfers in retaliation for his filing a disciplinary grievance against her. Specifically, relator charged Baker with twice filing frivolous lawsuits and engaging in conduct that (1) involves dishonesty, fraud, deceit, or misrepresentation, (2) is prejudicial to the administration of justice, and (3) adversely reflects on her fitness to practice law. The parties entered into several stipulations of fact and submitted 23 stipulated exhibits.

{¶ 3} Baker and the unintended recipient of the fund transfers testified at a hearing before a three-member panel of the Board of Professional Conduct. Following the hearing, the panel issued a report in which it found by clear and convincing evidence that Baker had committed each of the charged rule violations.

In the presence of numerous aggravating factors and just one mitigating factor, the panel recommended that Baker be suspended from the practice of law for one year, with six months conditionally stayed, and that certain conditions be placed on her reinstatement to the practice of law. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 4} Baker raises nine objections to the board's findings of fact and conclusions of law, arguing, among other things, that relator's complaint is the result of retaliation and institutional animus, that our regulation of the conduct at issue here violates the First Amendment to the United States Constitution, and that relator failed to prove its case by clear and convincing evidence. She urges that the complaint against her should be dismissed. Relator responded to Baker's objections and raises a single objection to the board's recommended sanction, arguing that an indefinite suspension is necessary to protect the public.

{¶ 5} For the reasons that follow, we overrule each of Baker's objections and adopt the board's findings of misconduct. We sustain relator's objection in part and suspend Baker from the practice of law for two years, with one year stayed on the conditions that she engage in no further misconduct and pay the costs of these proceedings. In addition to the requirements of Gov.Bar R. V(24), we condition Baker's reinstatement to the practice of law on the submission of proof that she has (1) paid any monetary sanctions that may be ordered by the Montgomery County Court of Common Pleas in case No. 2024-CV-05626, (2) completed six hours of continuing legal education ("CLE") focused on legal ethics and professionalism, (3) submitted to a mental-health evaluation conducted by the Ohio Lawyers Assistance Program ("OLAP") after the issuance of the suspension order in this case, and (4) complied with all of OLAP's treatment recommendations.

## I.  FINDINGS OF FACT AND MISCONDUCT

### A.  The mistaken Zelle transfers

{¶ 6} On September 19 and 20, 2023, Baker used Zelle, an electronic-payment service, with the intent to transfer $550 (in two separate payments of $250 and $300) from her law practice's operating account to another bank account that she held jointly with her husband, Zachary Reynolds of Dayton, Ohio ("Ohio Zachary Reynolds").  She inadvertently transferred those funds to a Charles Schwab account belonging to a different Zachary Reynolds ("Reynolds") who resides in Downers Grove, Illinois.

{¶ 7} Upon noticing the unexpected deposits to his bank account, Reynolds immediately contacted his bank.  During Baker's disciplinary hearing, Reynolds testified that he did not file a formal fraud complaint with the bank at that time, because he wanted to make sure that his wife was not expecting the transfers.

{¶ 8} Baker discovered her error around September 21, when the funds had not appeared in the intended receiving account.  She testified that she spent approximately eight hours identifying Reynolds as the recipient of the transfers and locating his contact information.  On September 22, Baker sent multiple communications to Reynolds by email, text message, and LinkedIn, a social-media platform.  She also contacted Reynolds's wife and several of his colleagues by various electronic means.

### B.  Baker's communications with Reynolds, his wife, and his colleagues

{¶ 9} Baker's earliest communication with Reynolds was an 8:04 a.m. email sent on September 22, 2023, which stated:

> On 19 Sep 2023 and 20 Sep 2023 you received $550 to your Zelle-linked Charles Schwab account.  These payments were in error and your retention of this money is unlawful.

Efforts are being made to recover the funding from the financial institutions involved. If you do not return the ill gotten funds within 24 hours, collection, garnishment, and all available recovery methods will commence, including notifying your employer of your conduct. This communication is an attempt to collect a debt.

{¶ 10} Baker closed the email with a signature block in which she identified herself as "Christine Baker, Esq." above her Ohio attorney-registration number, business address, cellphone number, fax number, and professional email address. At 9:30 a.m., Baker sent Reynolds the same message by text but omitted the signature block and did not otherwise identify herself. She also left a voicemail message on Reynolds's cellphone.

{¶ 11} When Reynolds received Baker's communications, he believed that he was the target of a scam, noting that Zelle cautions users to be wary of unknown people contacting them to request money, especially with urgent demands. Nevertheless, he responded to Baker's first text message, stating, "Considering this is your error, I find your threats offensive and they are noted. You can follow the appropriate channels with Charles Schwab to recoup YOUR mistake." (Capitalization in original.)

{¶ 12} After receiving Reynolds's text response, Baker replied, "Thank you for your reply. Thank you for confirming your receipt of funds. I am going to sue you in small claims court and broadcast the unassailable morality of corporate recruiter Z. Reynolds to the widest possible audience. You are an asset to the Reynolds surname." She then sent a photo of a man pushing a dog in a stroller, followed by a text stating, "This is the brain injured man you stole from. Zach Reynolds (not the thief, that is you)." In another text, she stated, "Your theft will be shared with the Special Olympics of Illinois [an organization for which Reynolds

served as a board member] and, soon, anyone with a basic Internet connection."[1] Baker did not identify the man in the photograph as her husband, nor did she tell Reynolds the money errantly transferred was *her* money. Instead, she claimed that the money belonged to the man in the photograph.

{¶ 13} Later that morning, Baker sent Reynolds a message through LinkedIn, using an account with the pseudonym "Callie Boom Boom," whose "experience" was listed as "dog walker." Although the board found that Baker used this pseudonym without clearly identifying herself, we note that she closed the message with her true name and cellphone number. In that message, Baker demanded return of the $550 and informed Reynolds that if the funds were not returned by 3:00 p.m. EST that day, she would initiate a civil action against him and his wife seeking damages for his "continued unlawful retention" of the funds.

{¶ 14} At 11:01 a.m., Baker sent Reynolds's wife, a schoolteacher, a message through Facebook Messenger using an account with the name Xi Yw. In that message, Baker informed Mrs. Reynolds that her husband had "wrongfully taken and retained $550" from Baker and threatened to sue both Reynolds and Mrs. Reynolds if the funds were not returned by 3:00 p.m. EST that day. Once again, she closed the message with her true name and phone number. Nine minutes later, Baker sent the same message to Mrs. Reynolds at her school email address.

{¶ 15} Between 12:23 p.m. and 1:30 p.m., Baker also contacted four of Reynolds's coworkers, including his immediate boss and the CEO of the company, and copied Reynolds on those messages. In her email to the CEO, Baker wrote, "Earlier today, your employee Zack Reynolds advised via text message that he is refusing to return $550 accidentally transmitted to his Charles Schwab account via Zelle. I am attaching his message. Is Mr. Reynolds' conduct consistent with your firm's values?"

---

1. The board found that Baker contacted the Special Olympics of Illinois, but we note that the record is unclear whether she actually followed through on her threat to do so.

{¶ 16} In her testimony before the disciplinary panel, Baker denied that she had contacted Reynolds's colleagues to pressure him to return the money. Instead, she claimed that she had communicated with them only to "fairly describe his conduct." Baker further indicated that her question about the firm's values was intended to be rhetorical. The panel and board, however, found that Baker's testimony on this issue was not credible, noting, "[T]here would be no reason for her to make the contact unless she expected consequences for Reynolds from his employer."

### C. Reynolds's efforts to return the errant funds and his attorney grievance

{¶ 17} On September 22, 2023, the same day that he received Baker's initial communications regarding the errant funds, Reynolds opened a formal dispute with Charles Schwab. According to Reynolds's testimony before the disciplinary panel, the bank advised him to not touch the funds and to allow its fraud department to handle the investigation. He further testified that he was specifically instructed by his bank *not* to independently return the funds to the sender.

{¶ 18} Reynolds testified that after receiving the barrage of communications from Baker, he phoned his bank again and was told that if he felt he was being harassed, he should go to his local police department. During his lunch break, he went to the Downers Grove Police Department. Reynolds stated that after reviewing the messages he had received from Baker, a police officer offered the opinion that the communications he was receiving were likely part of a scam because real attorneys would not risk their livelihood over "something like this." According to Reynolds, the officer advised him to ignore the communications from Baker and follow his bank's instructions.

{¶ 19} Reynolds testified that he followed the bank's advice and did not touch the erroneously deposited funds. On September 26, 2023, his bank informed him that the errantly transferred funds had been removed from his account. Baker

testified that the funds were back in her account by October 3—exactly two weeks after she initiated the first fund transfer to Reynolds.

{¶ 20} On September 27, 2023, Reynolds filed a grievance with relator regarding Baker's efforts to recover the erroneously transferred funds.

### D. Baker's civil litigation against Reynolds

#### 1. First civil action in the Montgomery County Court of Common Pleas

{¶ 21} Baker testified at her disciplinary hearing that once the misdirected funds were returned to her bank account in early October 2023, she abandoned her efforts to sue Reynolds. But after learning of his grievance and meeting with relator's investigator on November 16, she decided to proceed with the threatened litigation. On November 17, she filed a civil lawsuit against Reynolds. *See Baker v. Reynolds*, Montgomery C.P. No. 2023 CV 06192. The board found that Baker had filed the lawsuit in retaliation for the grievance Reynolds had filed against her.

{¶ 22} In her initial complaint, Baker alleged three causes of action: conversion, defamation per se, and defamation per quod.[2] Baker also falsely alleged that Reynolds "accepted each of the two payments via Zelle." During Baker's disciplinary hearing, Reynolds testified that no action is required for a Zelle recipient to "accept" a transfer of funds; the funds are automatically transferred to the recipient's account. Baker admitted as much in a January 10, 2024 email to relator's investigator—though when questioned on the topic during her disciplinary hearing she claimed that she did not know whether that was the case.

---

2. "Defamation is defined as a false publication which injures a person's reputation." *Dale v. Ohio Civ. Serv. Emps. Assn.*, 57 Ohio St.3d 112, 117 (1991), citing *Cleveland Leader Printing Co. v. Nethersole*, 84 Ohio St. 118 (1911). A statement that on its face reflects on the character of a person by bringing the person into ridicule, hatred, or contempt, or injures the person in the person's trade or profession is defamatory per se, and damages are presumed. *Becker v. Toulmin*, 165 Ohio St. 549, 553 (1956). In contrast, when a statement is found to be defamatory through interpretation, innuendo, or the consideration of extrinsic evidence, it is defamatory per quod, and special damages must be pleaded and proved. *Id*. at 556.

**{¶ 23}** Baker also falsely alleged in her civil complaint that Reynolds had "advised in writing" that "he would take no steps to return the money," and that "as he promised, Zack Reynolds took no steps to return [her] money." Further, she claimed, "Mr. Reynolds advised me in writing that, to recover my money, I would have to 'serve him with papers.'" She sought damages of $80,000 on her defamation claims and $2,500 on her conversion claim.

**{¶ 24}** Contrary to Baker's allegations, Reynolds had texted her on September 26, 2023, stating, "As I mentioned to you, as advised by my bank and attorney, Schwab's fraud department is handling the dispute . . . based on your behavior all involved assume this is a scam. If it's not a scam, you should be ashamed and embarrassed by your behavior." (Ellipsis in original.) After receiving another text from Baker requesting that he refer her to his attorney, Reynolds wrote, "I suggest you call Charles Schwab or formally serve me papers. I will no longer respond to any attempts to contact me." Nevertheless, Baker sent Reynolds another text expressing her belief that he did not have legal counsel and threatening to serve him with a legal complaint at his home, and if those attempts were not successful, his office. Reynolds replied, stating in part, "I do not have your money. I reported it to Charles Schwab as not being mine and they withdrew it from my account."

**{¶ 25}** Further demonstrating the falsity of Baker's allegations against Reynolds, Baker conceded at her disciplinary hearing that it was reasonable for Reynolds to have been suspicious of the situation and to have followed his bank's advice. In fact, she testified that "the only appropriate response [was] for Mr. Reynolds to . . . notify his banking institution and request reversal of the payments,"—though she maintained that that was not, in fact, his response. Baker further conceded that a week was a reasonable amount of time for the bank's fraud department to investigate and reverse the charges.

**{¶ 26}** After Baker filed her civil complaint, Reynolds hired Illinois attorney Eric Sparks to assist him. Sparks spoke to Baker by telephone on

November 27, 2023, and sent her an email requesting that she dismiss her complaint against Reynolds. Baker responded to the email, informing Sparks that she intended to amend her civil complaint and demanding $2,500 to settle the case.

{¶ 27} On December 4, Baker filed a motion for injunctive relief in her civil action seeking to enjoin Sparks from practicing law in Ohio—despite the facts that Sparks was not a party to the action and had not attempted to file any pleading in an Ohio court. And on December 5, Baker amended her civil complaint to add claims for abuse of process and negligent infliction of emotional distress.

### 2. Removal to federal district court and voluntary dismissal

{¶ 28} Reynolds hired the Dayton office of the law firm Dinsmore & Shohl, L.L.P., to defend him in the civil action filed by Baker. With the firm's assistance, the action was removed to federal court based on 28 U.S.C. 1332, diversity of citizenship, *see Baker v. Reynolds*, No. 3:23-cv-00380 (S.D.Ohio Dec. 18, 2023), and Sparks applied to be admitted to that court pro hac vice. Baker then sought and obtained leave to amend her complaint and added Dinsmore & Shohl, and Gould & Ratner, L.L.P., Sparks's employer, as defendants.

{¶ 29} On January 21, 2024, Baker sought leave to dismiss the federal case without prejudice. In her motion to dismiss, she attempted to justify her civil action by claiming, "Zachary Reynolds, of Downers Grove, Illinois, has weaponized the attorney grievance process." She asserted in her motion to dismiss that Reynolds had made "contradictory claims," engaged in "falsehoods," submitted "an incomplete text message record," and that he had "taunted [her], threatened [her] with criminal sanction, and told [her] to 'get help.'" Baker concluded her motion by stating, "[W]ith the information at hand, the Defendants' behavior—untruthful, probably unprincipled—is not bad enough to merit consuming significant judicial, organizational, and personal resources. At least not today."

{¶ 30} During her disciplinary hearing, Baker testified that she dismissed the federal case because the presiding magistrate was the immediate past president

of the Dayton Bar Association and the Dayton Bar Foundation, and a donor to the bar association. Baker contended that she "was getting some demeanor from the bench" that her case "was unwelcome to the federal court."

{¶ 31} As part of this disciplinary process, Reynolds submitted invoices demonstrating that he had incurred $21,665.80 in attorney fees defending against Baker's initial lawsuit—$15,039.35 with Gould & Ratner and $6,616.45 with Dinsmore & Shohl. He also testified that he had paid those fees.

### 3. Baker refiles civil action in common pleas court after receiving notice of relator's intent to file formal disciplinary complaint

{¶ 32} On September 20, 2024, relator sent Baker notice of its intent to file a formal disciplinary complaint against her; she received the complaint shortly thereafter. Although nothing had transpired between Baker and Reynolds after Baker dismissed the federal action, Baker refiled her civil complaint in the Montgomery County Common Pleas Court on October 30, 2024. *See Baker v. Reynolds*, Montgomery C.P. No. 2024-CV-05626.

{¶ 33} In her refiled complaint, Baker limited her request for damages to $15,500—under the $75,000 threshold for diversity jurisdiction, *see* 28 U.S.C. 1332—which prevented the case from being removed to federal court a second time. During her disciplinary hearing, Baker testified that her civil case "continues with the express written permission of two jurists." However, no evidence supports this assertion, and during Baker's disciplinary hearing, a motion to dismiss Baker's refiled complaint was pending.

{¶ 34} The board determined that Baker continued to pursue her complaint against Reynolds despite her acknowledgement that (1) her own error had caused $550 of her money to be transferred to Reynolds and (2) the funds were promptly returned to her solely as the result of Reynolds's actions.

{¶ 35} Furthermore, the board found that Baker refiled her complaint against Reynolds in retaliation for filing his grievance that initiated relator's formal

disciplinary proceedings against her—even though she was aware of this court's holding that "[a] statement made in the course of an attorney disciplinary proceeding enjoys an absolute privilege against a civil action based thereon as long as the statement bears some reasonable relation to the proceeding," *Hecht v. Levin*, 1993-Ohio-110, paragraph two of the syllabus.

{¶ 36} In addition to refiling her civil action against Reynolds, the board found that Baker has repeatedly disparaged Reynolds in the context of these disciplinary proceedings. For example, in her answer to relator's October 31, 2024 certified disciplinary complaint, Baker stated, "I told Illinois Zachary Reynolds that he was stealing from a disabled Ohio man named Zachary Reynolds. I did call Mr. Reynolds a thief (he is), promised to assert that he is unsuitable for serving the disabled (he is), and threatened to broadcast Mr. Reynolds' misdeeds." Baker continued her attack in her answer to relator's amended complaint, referring to Reynolds as "a liar and a thief." In her answers to relator's amended complaint, she claimed that in addition to lying to his wife, his colleagues, and his attorney, Reynolds lied to relator when he (1) reported that Ohio Zachary Reynolds was her client, (2) presented an incomplete record of their text messages, and (3) stated that he had alerted his bank of the errant Zelle payments on September 21, 2023.

### E.  Rule violations found by the board

{¶ 37} The board found that Baker's conduct violated Prof.Cond.R. 3.1 (prohibiting a lawyer from asserting an issue in a proceeding unless there is a nonfrivolous basis in law and fact for doing so), 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

{¶ 38} With regard to the Prof.Cond.R. 3.1 violation, the board found that the totality of the evidence demonstrates that Baker did not pursue civil litigation

against Reynolds for legitimate legal objectives. Specifically, the board found that the timing of her initial filing—one day after meeting with relator's investigator regarding Reynolds's grievance—"is strongly indicative of an improper purpose." The board also found that Baker's claims for conversion, defamation, abuse of process, and negligent infliction of emotional distress lacked a proper factual and legal foundation and were not pursued for legitimate legal objectives. Instead, the board stated, "[Baker's] actions were motivated by personal animosity and a desire to retaliate against Reynolds for filing a bar grievance" against her. The board additionally found that Baker's allegations that Reynolds defamed her by making knowingly false statements in his grievance were unsupported by the record and that her defamation claims in her civil complaints are barred by *Hecht*, 1993-Ohio-110.

{¶ 39} With regard to the Prof.Cond.R. 8.4(c) violation, the board found that Baker repeatedly and falsely characterized Reynolds's actions as "theft" or "stealing" in her publicly filed answers to relator's disciplinary complaints, falsely alleged in her civil complaints that Reynolds had taken affirmative action to "accept[]" the two payments that she had erroneously directed to his bank account and that he had "advised in writing" that "he would take no steps to return the money." In addition to finding that the evidence proved those allegations to be demonstrably false, the board noted that Baker took no action to correct the allegations in her complaint after learning of their falsity.[3] The board further determined that the $80,000 in damages that Baker sought in her initial litigation was grossly disproportionate to the $550 that she had mistakenly transferred to Reynolds's bank account.

---

3. Although not charged in relator's amended complaint, we note that Prof.Cond.R. 3.3(a)(1) prohibits a lawyer from knowingly failing to correct a false statement of material fact or law previously made to the tribunal by the lawyer.

{¶ 40} The board noted that Baker's communications with Reynolds were not always consistent. She sometimes claimed that the errant funds were her own, and at other times claimed that the funds belonged to a "brain injured man"—and she did not initially disclose that that man was her husband, whose last name was different from her own. The board also found that Baker had engaged in deceptive conduct by using pseudonyms and aliases to communicate with Reynolds without clearly identifying herself—though we note that she did include her true name and phone number in the body of those messages. In addition, the board found that Baker continued to engage in dishonesty throughout the disciplinary proceedings by refusing to acknowledge the impropriety of her conduct and instead attempting to frame her actions as constitutionally protected speech and zealous advocacy.

{¶ 41} With regard to the Prof.Cond.R. 8.4(d) violation, the board found that rather than use the legal system for legitimate dispute-resolution purposes, Baker abused it "as a tool for personal vendetta" and improperly burdened the courts with frivolous litigation. The board determined that the timing and content of Baker's civil filings clearly demonstrated her retaliatory intent to punish Reynolds for exercising his right to file an ethics grievance against her and that the expansion of her litigation to name Reynolds's attorneys as defendants served no legitimate purpose besides increasing litigation costs and pressuring Reynolds to withdraw his grievance. The board also found that Baker's contacts with Reynolds's employer and colleagues served no legitimate purpose in recovering her funds and were instead designed to harass and embarrass Reynolds. Moreover, her continued reference to Reynolds as a "thief" in publicly filed legal communications after her funds were returned improperly disparaged his character and reputation without factual basis. The board determined that those actions, individually and collectively, demonstrated that Baker had engaged in conduct prejudicial to the administration of justice, undermining public confidence in the legal profession and improperly burdening the courts with frivolous litigation.

{¶ 42} And finally, with regard to the Prof.Cond.R. 8.4(h) violation, the board found that the barrage of emotionally charged, threatening, and unprofessional communications Baker sent to Reynolds, his wife, and his employer, through email, text messages, and various social-media platforms went far beyond zealous advocacy. The board found that these communications were motivated by personal animosity and were intended to intimidate Reynolds and damage his professional reputation over a personal financial dispute that was settled in a matter of days. And not only was Baker's civil litigation retaliatory, but the damages she sought were grossly disproportionate to the $550 that she had mistakenly transferred to Reynolds, and her expansion of the litigation to name Reynolds's attorneys as defendants exhibited a fundamental misunderstanding of or disregard for the proper boundaries of legal advocacy. In addition, the board found that Baker's refusal to acknowledge the impropriety of her conduct during her disciplinary-hearing testimony and pattern of behavior demonstrated "poor judgment, lack of emotional control, and an inability to maintain professional boundaries—all qualities that adversely reflect on [her] fitness to practice law."

{¶ 43} For violating Prof.Cond.R. 3.1, 8.4(c), 8.4(d), and 8.4(h), the board recommended that Baker be suspended from the practice of law for one year, with six months conditionally stayed, and that certain conditions be placed on her reinstatement to the practice of law. That recommendation is more fully discussed in Parts III and IV below.

## II. BAKER'S OBJECTIONS TO THE
## DISCIPLINARY PROCESS AND THE BOARD'S FINDINGS

{¶ 44} Baker responds to the board's report and recommendation by raising nine objections addressing all phases of the disciplinary process, beginning with relator's investigation and ending with the board's findings of misconduct, and urges us to dismiss this case. For ease of discussion, we will address Baker's first objection and then address the remaining objections out of order and, in some

instances, grouped by related issues.  And for the reasons that follow, we overrule each objection.

### A.  *Baker has not offered any evidence that the delay in relator's investigation was unreasonable or that it violated her right to a fair hearing*

{¶ 45} In her first objection, Baker asserts for the first time that relator's certified grievance committee unreasonably and intentionally delayed the investigation of this matter beyond the time permitted by our rules.  Gov.Bar R. V(9)(D) provides that the investigation of grievances by the Office of Disciplinary Counsel or a certified grievance committee "shall be concluded within two hundred seventy days from the date of the receipt of the grievance" and that a "decision as to the disposition of the grievance shall be made within thirty days after conclusion of the investigation."

{¶ 46} Gov.Bar R. V(9)(D)(1) permits the investigating entity to request from the director of the Board of Professional Conduct an extension of time to complete an investigation and specifies that "[n]o investigation shall be extended beyond one year from the date of receipt of the grievance."  However, the rule also provides that these time limits are not jurisdictional and that "[n]o investigation or complaint shall be dismissed unless it appears that there has been an unreasonable delay and that the rights of the respondent to have a fair hearing have been violated."  Gov.Bar R. V(9)(D)(2).

{¶ 47} In this case, Baker asserts that Reynolds filed his grievance on September 27, 2023, and then "[n]othing happened for exactly 365 days" until relator issued a letter advising Baker of its forthcoming complaint.  (Underlining in original.)  The record shows that relator completed its investigation and sent Baker notice of its intent to file a formal disciplinary complaint on September 20, 2024—within one year of the date on which Reynolds filed the grievance.  Because Baker has offered no evidence that the delay was unreasonable or that her rights to a fair hearing have been violated, we overrule her first objection.

### B. Baker received all the process she is due

{¶ 48} In her third, sixth, and eighth objections, Baker alleges that relator's complaint was motivated by retaliation and institutional animus, that the board was biased against her, and that consequently, she has been deprived of due process of law.

{¶ 49} With these objections, Baker attempts to convert this disciplinary proceeding into a referendum on what she perceives to be a host of bad acts committed by members of the Dayton Bar Association and the hearing panel rather than focus on the single subject of this proceeding—her own misconduct. Among other things, Baker alleges in her third and sixth objections that (1) two members of the bar association had previously "manufactured" disciplinary grievances against her, (2) members of the Dayton Bar Association engaged in inappropriate and degrading conduct during CLE presentations sponsored by relator and that relator refused to investigate, (3) a member of relator's certified grievance committee suggested that she was drinking alcohol during an investigatory meeting conducted on Zoom, and (4) relator's investigator was ill-prepared and "exploded in a rage" while meeting with her to discuss Reynolds's grievance. Baker offers no citations to the record to substantiate her claims.

{¶ 50} The disciplinary-hearing transcript shows that of those allegations, only the last two were mentioned during her disciplinary hearing. And the only evidence that Baker submitted regarding those incidents was her own affidavit memorializing her perception of her meeting with the investigator and her testimony, in which she ultimately concluded that it was "just a[n] odd meeting that . . . was uncomfortable for both" her and relator's investigator.

{¶ 51} The disciplinary-hearing transcript further belies Baker's claim in her eighth objection that the board abandoned its neutrality and favored relator. Baker quotes a point during the disciplinary hearing in which relator's counsel indicated that he did not have a document but that he could find it and to which,

Baker contends, the panel chair "effectively t[ook] on the relator's advocacy role" by responding, "'I don't think we need it.'"

{¶ 52} A review of the transcript shows that relator's counsel had questioned Baker regarding Exhibit 23, her motion to dismiss her complaint in the civil action that had been removed to federal court, when the panel chair asked how the law firms representing Reynolds came to be named as defendants in that case after noticing that they were listed in the motion's caption. Baker admitted that she had added the two law firms as defendants but stated that she did not recall the specific circumstances in which she had added them. In response to the panel chair's asking for the document in which Baker had named the law firms, relator's counsel stated, "I don't have that document. If I want to take a minute, I can find it, or we can go on. Whatever the panel wants me to do." The panel chair replied, "I don't think we need it."

{¶ 53} At that point, Baker had already admitted that she had added the law firms as defendants in her civil litigation, and relator had already offered another court filing that confirmed that fact. The document in which she named the law firms—Baker's motion to amend the complaint—would have constituted cumulative evidence on that issue. Evid.R. 403(B), made applicable to attorney-discipline proceedings by Gov.Bar R. V(27)(A), permits a court—or in this case, the board—to exclude evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." The panel chair appropriately exercised that discretion in determining that spending additional time searching for cumulative evidence was unnecessary.

{¶ 54} The fundamental requirements of due process are notice and the opportunity to be heard. *In re Ruffalo*, 390 U.S. 544, 550 (1968), citing *Selling v. Radford*, 243 U.S. 46, 51 (1911). In this case, Baker has not alleged that relator's complaint failed to give her adequate notice of the charges against her. And we have recognized that the requirement of an opportunity to be heard has been

satisfied in attorney-discipline proceedings "when the respondent is afforded a hearing, the right to issue subpoenas and depose witnesses, and an opportunity for preparation to explain the circumstances surrounding his actions." *Disciplinary Counsel v. Character*, 2011-Ohio-2902, ¶ 76, citing *Cleveland Bar Assn. v. Acker*, 29 Ohio St.2d 18, 20 (1972).

{¶ 55} Baker has not shown that any of the allegations in her third, sixth, and eighth objections deprived her of the opportunity to be heard. On these facts, Baker has received all the process she is due. We therefore overrule her third, sixth, and eighth objections to the board's report.

### C. This court has the authority to regulate Baker's conduct in this case

{¶ 56} In her fifth objection, Baker contends that the conduct at issue in this case consists of private speech that is both beyond the scope of attorney regulation and protected by the First Amendment to the United States Constitution. Baker argues that because she was acting on her own behalf and was not representing a client or otherwise providing legal services on behalf of another person, she was engaging in personal expression that is not subject to regulation by this court.

{¶ 57} This court has original jurisdiction over the "[a]dmission to the practice of law, the discipline of persons so admitted, and all other matters relating to the practice of law." Ohio Const., art. IV, § 2(B)(1)(g). The preamble to the Rules of Professional Conduct instructs, "As an officer of the court, a lawyer not only represents clients but has a special responsibility for the quality of justice." Prof.Cond.R., Preamble [1]. The preamble explains, "In addition, there are rules that apply to lawyers who are not active in the practice of law or to practicing lawyers even when they are acting in a nonprofessional capacity," offering the example that "a lawyer who commits fraud in the conduct of a business is subject to discipline for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.* at [3]. Recognizing the vital role that lawyers play in the preservation of society, the preamble advises, "A lawyer's conduct should conform

to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs," and emphasizes, "A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others." *Id.* at [5].

{¶ 58} We have previously rejected an attorney's claim that we lacked jurisdiction to discipline her for conduct in a business transaction unrelated to her practice of law, noting that we have consistently disciplined attorneys for personal conduct that violates criminal statutes. *Character*, 2011-Ohio-2902, ¶ at 67-68; *see also Disciplinary Counsel v. Connors*, 2020-Ohio-3339 (disciplining an attorney convicted of felony use of a minor in nudity-oriented material or performance); *Columbus Bar Assn. v. Okuley*, 2018-Ohio-3857 (disciplining an attorney who intentionally caused a collision with a bicyclist, provoked a physical altercation with an eyewitness to the collision, and made false statements about the incident to law enforcement and during the ensuing criminal, civil, and disciplinary proceedings); *Disciplinary Counsel v. Blakeslee*, 2023-Ohio-4202 (disciplining an attorney who deposited cans of feces in various locations, including a victim-advocacy center, that resulted in minor-misdemeanor charges of disorderly conduct and littering). We have also disciplined attorneys for personal conduct involving fraud, deceit, or misrepresentation even when it is not evident that criminal charges have resulted. *See, e.g.*, *Lake Cty. Bar Assn. v. Baxter*, 4 Ohio St.3d 82 (1983) (disciplining an attorney who engaged in serious fraudulent transactions by use of checking accounts in a pattern commonly known as "check kiting," with no mention of corresponding criminal charges).

{¶ 59} In this case, Baker may not have been representing a client when she raised her private grievances against Reynolds through communications with him, his wife, his employer, and his colleagues. But she sent her emails—including her very first communication with Reynolds—from her professional email address, and she closed those communications with a signature block that identified her as

"Christine Baker, Esq.," followed by her Ohio attorney-registration number, business address, cellphone number, fax number, and professional email address. While Baker was attempting to recover the personal funds that she erroneously had sent to Reynolds, she was not acting entirely in a private capacity—she was holding herself out as an attorney. She acknowledged as much in a text to Reynolds, in which she informed him, "If you are represented by counsel, please refer that individual to me. Under Ohio Professional Rule 4.2 an attorney cannot discuss a dispute with someone known to be represented by an attorney." As such, there can be no dispute that Baker was acting as an attorney and that her conduct falls plainly within this court's original jurisdiction over the discipline of attorneys admitted to the practice of law in Ohio. We therefore overrule Baker's fifth objection to the board's report and recommendation.

### D. Baker has waived her overbreadth and vagueness arguments by failing to develop them

{¶ 60} In her seventh objection, Baker contends that "attorneys do not surrender their free speech rights upon entering the profession" and that overly broad and vague restrictions on attorney speech "create a chilling effect on advocacy and undermine the role of lawyers as defenders of justice."

{¶ 61} In support of that contention, Baker asserts that in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), the United States Supreme Court struck down a Nevada rule that broadly prohibited attorneys from making extrajudicial statements that could prejudice a case. She further asserts that in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), the Court invalidated a rule that barred judicial candidates from announcing their views on legal issues, reasoning that speech restrictions on legal professionals must survive strict scrutiny. Baker argues that "[i]f even judges—who must remain impartial—cannot be broadly gagged, then private attorneys, who serve as zealous advocates, must enjoy at least as much protection."

**{¶ 62}** The facts of this case are distinguishable from *Gentile* and *White* in two important respects. First, Baker has not identified or challenged any rule that purportedly restricted her speech, let alone a content-based restriction, like the canon of judicial conduct at issue in *White*. *See White* at 768. Second, while *Gentile* and *White* involved core political speech, *see id.*; *Gentile* at 1034, the speech at issue in this case involved a private concern—her effort to recover the $550 she mistakenly transferred to Reynolds.

**{¶ 63}** "'"[N]ot all speech is of equal First Amendment importance."'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011), quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988), quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 (1985). "'[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.'" (Internal quotation marks omitted in *Snyder*.) *Snyder* at 452, quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983). However, "where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Id*. The Court explained:

> This is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: "[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas': and the 'threat of liability" does not pose the risk of "a reaction of self-censorship" on matters of public import.

(Internal quotation marks omitted in *Snyder*.) *Id.*, quoting *Dun & Bradstreet* at 760.

**{¶ 64}** In making her assertions that "overbroad" and "vague" ethical rules chill protected speech, Baker has failed to identify any specific rule of professional

22

conduct as the target of her claim and has likewise failed to identify any specific speech that has been restrained in this case. In addition, she has failed to offer any examples to demonstrate that any of the Rules of Professional Conduct at issue in this case prohibit a substantial amount of protected speech relative to their plainly legitimate sweep of ensuring that attorneys behave ethically. However, there can be no reasonable dispute that Baker's making false statements knowingly or with reckless disregard for their truth or falsity in her communications, her civil complaints, and her responses to relator's investigation plainly falls within the conduct prohibited by the Rules of Professional Conduct.

{¶ 65} "We are not obligated to search the record or formulate legal arguments on behalf of the parties." *State v. Quarterman*, 2014-Ohio-4034, ¶ 19. "'"It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."'" (Ellipsis added in *Citizens Awareness Network*). *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997), quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm.*, 59 F.3d 284, 293-294 (1st Cir. 1995), quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

{¶ 66} For these reasons, we deem Baker's claims of unconstitutional overbreadth and vagueness forfeited and overrule her seventh objection to the board's report and recommendation.

### E. The record does not support Baker's allegations that Reynolds was dishonest or acted with malice in filing his grievance against her

{¶ 67} In her second and fourth objections to the board's report, Baker contends that the board erroneously determined that Reynolds's testimony was more credible than her own testimony. She further contends that Reynolds filed a "malicious and dishonest grievance" against her and that he publicly disclosed that grievance before the board found probable cause to certify relator's complaint. Specifically, Baker asserts that the filing of her civil actions was not undertaken in

retaliation for Reynolds's filing of a grievance against her but was instead "a consequence of his misdeeds and omissions." She therefore urges us to permit attorneys to file civil claims for malicious prosecution or abuse of process when a grievance is filed with malice and without probable cause, which would require us to revisit our holding in *Hecht. See Hecht*, 1993-Ohio-110, at paragraph two of the syllabus ("A statement made in the course of an attorney disciplinary proceeding enjoys an absolute privilege against a civil action based thereon as long as the statement bears some reasonable relation to the proceeding."). These objections lack merit.

{¶ 68} In our independent review of attorney-discipline cases, we generally defer to the hearing panel's credibility determinations unless the record weighs heavily against those findings because the panel was able to observe the witnesses firsthand. *Cincinnati Bar Assn. v. Statzer*, 2003-Ohio-6649, ¶ 8, citing *Cleveland Bar Assn. v. Cleary*, 2001-Ohio-1326, ¶ 18. "[I]t is of no consequence that the board's findings of fact are in contravention of [the] respondent's or any other witness's testimony. 'Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.'" *Disciplinary Counsel v. Zingarelli*, 2000-Ohio-140, ¶ 33, quoting *Cross v. Ledford*, 161 Ohio St. 469, 478 (1954).

{¶ 69} In this case, the panel found Reynolds's testimony about his conduct following his receipt of Baker's two misdirected fund transfers totaling $550 to be more credible than Baker's interpretation of Reynolds's conduct. Reynolds testified that when he noticed two unexpected deposits into his account, he immediately contacted his bank—before Baker had even reached out to him—but that he decided to double check with his wife to make sure that she was not expecting the funds before authorizing the bank to start an investigation. Reynolds testified that the bank told him it was very important that he not touch the funds

and that if someone contacted him, he should not return the money himself but allow the bank to handle it.

{¶ 70} But upon noticing her mistake, Baker did not simply ask that Reynolds contact his bank to reverse the transactions. Instead, she sent a barrage of emails, text messages, and social-media messages in which she identified herself as an attorney and accused Reynolds of engaging in unlawful behavior. She threatened to commence legal proceedings and to inform Reynolds's employer of his conduct if he did not return the money within 24 hours. But within hours of her initial email, Baker messaged Reynolds and his wife, threatening to sue them both if the funds were not returned by 3:00 p.m. that day. She also contacted Reynolds's employer and colleagues claiming that he was "refusing to return $550 accidentally transmitted to his Charles Schwab account via Zelle."

{¶ 71} Contrary to Baker's testimony and assertions, Reynolds never told her, in writing or otherwise, that he would not return the funds she erroneously had transferred into his account but, rather, directed her to contact his bank. When asked at her disciplinary hearing if it was reasonable for Reynolds to be suspicious of the "whole situation" and that the "only appropriate response [was] for Mr. Reynolds to . . . notify his bank institution and request reversal of the payments," Baker agreed. Notifying his bank is exactly what Reynolds did.

{¶ 72} Baker also alleges that Reynolds made false statements in his grievance, in his testimony before the panel, and to his colleagues and spouse by (1) claiming that Ohio Zachary Reynolds was her client—when in fact, he was her husband, (2) expressing surprise that she was a "real attorney" and claiming that he believed himself to be the target of a "phishing scam" even though she had provided him with her name, phone number, address, and Ohio attorney-registration number, (3) providing relator with an incomplete record of their text messages, (4) telling his wife, "[Baker] cannot sue us because it is her error," and (5) falsifying evidence of his alleged damages.

25

{¶ 73} The statements that Reynolds made to reassure his wife and alert his colleagues of his predicament are not relevant to this proceeding and offer little more than Reynolds's state of mind when he made them. The record shows that Reynolds was not sure who Baker was representing as she sought to recover the $550 erroneously transferred into his bank account. Reynolds testified that he initially believed that Baker's communications involved a client representation and that he learned that Ohio Zachary Reynolds was Baker's husband only *after* he filed his grievance. And in light of the suggestions Reynolds had received from his bank and local police department that he could possibly be the victim of a scam, Baker's erratic and threatening messages gave him reason to believe that Baker was not in fact an attorney and that he was the victim of a phishing scam.

{¶ 74} Reynolds testified at Baker's disciplinary hearing, stating in response to her questioning that he did not correct his grievance because "there still was a lot of uncertainty around a lot of things" and that he believed that the bar association's role was to conduct its own investigation and determine the truth. Although Reynolds did not submit a complete record of his communications with Baker, there is no indication that he was attempting to conceal anything. He testified, "Those texts that I sent supported everything that I claimed in the [grievance]." As part of the investigation, Baker provided a complete copy of the text messages to relator, and that copy was admitted into evidence as Exhibit 22. And while Baker alleges that Reynolds falsified evidence of the monetary damages he suffered as a result of her misconduct, she has presented no evidence that the invoices for his attorneys' services are fraudulent.

{¶ 75} Baker's claims that her civil actions against Reynolds are somehow justified by his alleged public disclosure of the grievance he filed against Baker are likewise without merit. It is true that Gov.Bar R. V(8)(A)(1) requires that all proceedings, documents, and deliberations relating to a disciplinary grievance and investigation be kept confidential prior to a probable-cause determination by the

board. However, a respondent may expressly and voluntarily waive that confidentiality. *See* Gov.Bar R. V(8)(A)(1)(a). And that is exactly what happened in this case.

{¶ 76} In her October 19, 2023 email response to relator's inquiry regarding Reynolds's grievance, Baker informed relator, "I do not wish this matter to be private or confidential," and asked relator to apprise her of any limitation on her ability to speak about the situation. And in her initial civil complaint filed against Reynolds on November 17, 2023, it was Baker—not Reynolds—who publicly disclosed the grievance and purported to attach a copy of that grievance as an exhibit thereto. Baker has offered no evidence to prove her allegation that Reynolds publicly disclosed the grievance he filed against her before she expressly waived confidentiality and disclosed the grievance herself.

{¶ 77} Based on the foregoing, ample evidence supports the board's implicit determination that Reynolds's testimony was credible and that Baker's testimony and allegations against Reynolds were not. Because the record does not weigh heavily against the board's credibility determinations, we overrule Baker's second objection to the board's report and recommendation. And because the record clearly and convincingly disproves Baker's claims that the allegations in Reynolds's grievance were dishonest or filed with malice, we overrule Baker's fourth objection to the board's report and decline to revisit our holding in *Hecht*.

### F. The board's findings of misconduct are supported by clear and convincing evidence

{¶ 78} In her ninth and final objection, Baker contends that the board's findings of misconduct are not supported by clear and convincing evidence. The only argument she makes in support of this contention is that the board "relied on incomplete text messages" and "failed to complete the record after [relator's investigator] lost emails wherein [she had] kept him apprised of the civil action at issue here, and criticized [her] for not taking [her] husband's name." As previously

discussed, Baker provided to relator a complete copy of her text messages, which were admitted into evidence as Exhibit 22. Furthermore, the panel chair and relator offered Baker the opportunity to supplement the record with any text messages that she believed were missing by the Wednesday after her March 20, 2025 disciplinary hearing. Baker did not avail herself of that opportunity.

{¶ 79} Despite Baker's claims, we find that with the exception of the findings related to Baker's use of pseudonyms and her alleged communication with the Special Olympics of Illinois, addressed above in Sections B and E of Part I, the board's findings of fact and misconduct as set forth above are supported by clear and convincing evidence. We therefore overrule Baker's ninth objection to the board's report and recommendation and adopt the findings of fact and misconduct set forth in Sections A through E of Part I as our own.

### III. THE BOARD'S RECOMMENDED SANCTION

{¶ 80} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 81} We have already discussed Baker's violations of her duties to the legal system, to the profession, to the public, and to her fellow attorneys. And we agree with the board's findings that Baker acted knowingly and intentionally throughout the course of her misconduct. She admitted at her disciplinary hearing that her communications with Reynolds were "intemperate," implying that she was aware of her emotional state yet chose to proceed with unprofessional conduct. The escalation of her conduct from her initial communication with Reynolds, to contacting his wife and employer, to filing her civil actions, shows deliberate and intentional decision-making rather than impulsive actions. The timing of her initial civil complaint, filed just one day after meeting with relator's investigator, shows calculation and intent to retaliate, and her continued pursuit of litigation even after

acknowledging the return of her misdirected funds demonstrates intentional conduct not motivated by a legitimate purpose.

{¶ 82} The board also found that Baker's conduct caused multiple harms to Reynolds, the legal system, and the profession. The board found that in addition to incurring more than $21,000 in legal fees to defend against Baker's meritless litigation, Reynolds testified credibly about the distress, fear, and anxiety Baker's aggressive communications and contact with his employer caused. With respect to the legal system, the board found that Baker's filings consumed judicial resources with meritless claims and that her retaliatory litigation against Reynolds for filing a disciplinary grievance against her threatens the self-regulatory nature of the legal profession, which depends on people being able to report potential misconduct without fear of reprisal. And with respect to the profession, the board found that Baker's misconduct reinforces negative public perceptions about lawyers using their legal knowledge to bully and intimidate others—particularly in minor disputes like the one here.

{¶ 83} The board found that six of the aggravating factors identified in Gov.Bar R. V(13)(B) are present in this case, namely that Baker (1) has a history of prior discipline, having previously been suspended for her failure to satisfy new-lawyers-training requirements, *see* Gov.Bar R. X(17)(B) and (C); (2) engaged in a continuous pattern of misconduct; (3) committed multiple offenses; (4) refused to acknowledge the wrongful nature of her misconduct or show remorse, maintaining that her actions were justified and attempting to frame her conduct as both zealous advocacy and constitutionally protected speech; (5) caused harm to a vulnerable victim who was drawn into this situation through no fault of his own after receiving the misdirected fund transfers and simply following his bank's instructions; and (6) has made no effort to make restitution, despite having caused Reynolds to incur significant legal expenses defending against her meritless claims. *See* Gov.Bar R. V(13)(B)(1), (3), (4), and (7) through (9). Given that Baker has been licensed to

practice law since 2012, the board found that Baker has substantial experience in the practice of law such that she should have understood the impropriety of her conduct and the ethical boundaries governing the profession.

{¶ 84} The board also considered several additional aggravating factors beyond those enumerated in Gov.Bar R. V(13)(B), including the calculated and retaliatory nature of Baker's litigation strategy and the stark disproportionality between the $550 mistaken fund transfers and the scope and intensity of Baker's response, not the least of which was her demand for more than $80,000 in damages.

{¶ 85} The board also expressed grave concern over statements that Baker made in her posthearing brief, including her unsupported allegations that the panel "needlessly interrupted and mischaracterized [her] case" and ruled prematurely on her case from the bench, and that "[b]y continuing to exercise its jurisdiction over this matter, the Panel participate[d] in the government sanction of [her] First Amendment protected speech . . . [and] violate[d] [her] right to due process and equal protection under the law."

{¶ 86} The board found that despite having access to the full hearing transcript, Baker mischaracterized the state of the record and that her allegations against the panel "suggest[] an alarming breakdown in her perception of professional boundaries and legal process." In addition to demonstrating Baker's unwillingness to accept responsibility for her misconduct, the board determined that her allegations exhibited a "troubling projection of blame onto the panel" in a way that resembles her projection of blame onto Reynolds. Ultimately, the board concluded that Baker's complaints about the disciplinary process arose more from her continuing belief that her conduct should not be subject to professional scrutiny than from any actual procedural deficiency.

{¶ 87} The board did not find that any of the mitigating factors identified in Gov.Bar R. V(13)(C)(1) through (9) are present. It did, however, attribute some mitigating effect to its recognition that Baker may face emotional challenges related

to her role as caregiver for her husband, who, she testified, suffered a brain injury more than 25 years ago. The extent of her husband's disability is not entirely clear from the record, as Baker testified that he is a full-time employee for the United States Environmental Protection Agency, with an accommodation that permits him to work remotely.

{¶ 88} In determining the appropriate sanction to recommend for Baker's misconduct, the board was guided by our holding that "[w]hen an attorney engages in a course of conduct that violates [an ethical rule prohibiting dishonesty, fraud, deceit, or misrepresentation], the attorney will be actually suspended from the practice of law for an appropriate period of time," *Disciplinary Counsel v. Fowerbaugh*, 1995-Ohio-261, syllabus. The board also found *Columbus Bar Assn. v. Elsass*, 1999-Ohio-93, and *Disciplinary Counsel v. Skolnick*, 2018-Ohio-2990, to be instructive.

{¶ 89} In *Elsass* the attorney filed a civil action against a former client alleging that she had defamed and slandered him by filing a disciplinary grievance against him. We found that Elsass had deliberately filed that action in violation of our holding in *Hecht*, 1993-Ohio-110, that a disciplinary complainant enjoys absolute privilege against a civil action based thereon. *Elsass* at ¶ 16. We determined that Elsass's lawsuit violated disciplinary rules of the former Code of Professional Responsibility that prohibited a lawyer from knowingly advancing an unwarranted claim, engaging in conduct prejudicial to the administration of justice, and filing suit knowing that it would serve merely to harass or maliciously injure another. *Id.* at ¶ 19.

{¶ 90} In addition to that misconduct, we also found that Elsass had continued to practice law while his license was under suspension and had engaged in other acts of dishonesty, fraud, deceit, or misrepresentation by failing to notify several clients of his earlier suspension from the practice of law. No aggravating factors were identified in our opinion, though as a mitigating factor we noted that

Elsass had "generally been an upstanding and active member of the community." *Id.* Citing Elsass's repeated acts of dishonesty and deceit, and his failure to abide by our previous suspension orders, we indefinitely suspended Elsass for his misconduct. *Id.*

{¶ 91} *Skolnick* did not involve retaliatory conduct but instead involved a single violation of Prof.Cond.R. 8.4(h) arising from an attorney's years-long verbal harassment and degradation of his paralegal, which included a single incident of sexual harassment. Although the board did not discuss the case in depth, we note that in contrast to the numerous aggravating factors present in this case, just two were present in *Skolnick*—a pattern of misconduct and harm to a vulnerable employee, *Skolnick*, 2018-Ohio-2990, at ¶ 9. And in comparison to the single mitigating factor present in this case, mitigating factors in *Skolnick* consisted of his clean disciplinary record, good character, cooperation in the disciplinary process, acknowledgment of his misconduct, and expression of remorse for his behavior, *id*. We imposed a one-year suspension, with six months conditionally stayed, for Skolnik's misconduct. *Id*. at ¶ 15.

{¶ 92} Weighing Baker's misconduct, the aggravating and mitigating factors, and these precedents, the board recommends that Baker be suspended from the practice of law for one year, with six months stayed on the condition that she refrain from further misconduct. In addition, the board recommends that Baker's reinstatement be conditioned on the submission of proof that she has (1) paid any monetary sanctions that may be ordered by the Montgomery County Court of Common Pleas in connection with her civil litigation against Reynolds, (2) completed six hours of CLE training on ethics and professionalism in addition to the hours required by Gov.Bar R. X, (3) submitted to a mental-health evaluation conducted by OLAP, and (4) complied with all of OLAP's treatment recommendations.

## IV. RELATOR'S OBJECTION TO THE RECOMMENDED SANCTION

{¶ 93} Relator objects to the sanction recommended by the board and argues that the facts of this case—particularly Baker's aggressive and retaliatory conduct directed toward Reynolds—warrant an indefinite suspension from the practice of law. Relator asserts that an indefinite suspension is necessary to protect the public and the disciplinary system from attorneys who file retaliatory civil suits against persons who have filed disciplinary grievances against them.

{¶ 94} In addition to *Elsass*, relator identifies another case in which an attorney filed a retaliatory civil action against a grievant: *Payson v. Spivey*, 2022-Ohio-1525. Payson, an attorney, filed a defamation action against a former client after that client had filed a disciplinary complaint against him and participated in fee arbitration to settle the dispute. The trial court in Payson's defamation case found that Payson had filed that action in retaliation for the former client's filing of the disciplinary complaint and that Payson's conduct during the defamation litigation caused the former client to incur nearly $30,000 in legal fees to defend the suit. Although disciplinary counsel filed a certified complaint with the Board of Professional Conduct charging Payson with misconduct related to his retaliatory defamation action, that disciplinary case was closed after we suspended Payson for an impairment under Gov.Bar R. V(15) in July 2024. *See Disciplinary Counsel v. Payson*, Board of Professional Conduct case No. 2023-027, and Ohio Supreme Court case No. 2024-0481.

{¶ 95} Our research shows that a few other civil claims or actions that have been filed by attorneys against disciplinary grievants have been dismissed or otherwise disposed on the authority of *Hecht*, 1993-Ohio-110. *See, e.g.*, *Deters v. Hammer*, 2021 WL 664011 (S.D.Ohio Feb. 19, 2021); *Nyce v. Jones*, 2019 WL 5862972 (S.D.Ohio Nov. 8, 2019); *WFG Natl. Title Ins. Co. v. Meehan*, 2018-Ohio-491, ¶ 14 (8th Dist.); *Eichenberger v. Graham*, 2013-Ohio-1203, ¶ 21 (10th Dist.);

*Young v. Jones*, 122 Ohio App.3d 539, 544-545 (6th Dist. 1997); *Vogel v. Skulich*, 1993 WL 347096, *3 (9th Dist. Sept. 15, 1993).

{¶ 96} The filing of just a handful of cases involving such retaliatory claims over more than 30 years hardly signals a routine, let alone epidemic, disregard of this court's holding in *Hecht*. Relator does not advance any additional legal authority beyond the board's report to support its argument that the nature and scope of Baker's misconduct warrants indefinite suspension from the practice of law.

{¶ 97} However, we agree that Baker's misconduct began with aggressive communications with Reynolds, in which she identified herself as an attorney and immediately threatened litigation if he refused to refund the $550 that she had mistakenly transferred to him. During the course of a single day, the communications escalated—with Baker falsely accusing Reynolds of theft and informing his wife, employer, and colleagues of his alleged misdeeds.

{¶ 98} Despite acknowledging that she received a full refund of the erroneously transferred funds as a direct result of Reynolds's actions, Baker continues to falsely maintain that Reynolds is a thief. Baker has wasted significant judicial resources by twice filing frivolous and retaliatory lawsuits against Reynolds because he exercised his right to file a disciplinary grievance against her—the first of those actions being filed just one day after she met with relator to discuss Reynolds's grievance. And although Baker dismissed her first complaint after it was removed to federal court, she retooled and refiled her complaint in the common pleas court just weeks after learning that relator intended to file a formal disciplinary complaint against her.

{¶ 99} Baker has inflicted substantial economic harm, anxiety, and embarrassment on Reynolds, who simply followed his bank's instructions to allow the bank to investigate and reverse the erroneous charges that Baker initiated. She also has levied false allegations against Reynolds, his attorneys, relator, and the

hearing panel that conducted her disciplinary hearing. Yet even in her posthearing brief and in her objections before this court, she maintains that she has done nothing wrong. Her lack of professional boundaries, judgment, and emotional control adversely reflect on her fitness to practice law and reinforce negative stereotypes of the profession. As troubling as her misconduct is, we do not believe that it warrants an indefinite suspension from the practice of law.

{¶ 100} In addition to *Elsass* and *Skolnick*, we find *Toledo Bar Assn. v. Yoder*, 2020-Ohio-4775, to be instructive. In *Yoder*, the attorney made false and threatening statements in written communications about the opposing party in a child-custody case and reported the opposing party to professional regulatory organizations solely to obtain an advantage in a civil matter. In legal filings, Yoder accused the magistrate presiding over the case of lying, making threats, and having a vendetta against him. And in another case, Yoder asserted that one of the opposing parties was a liar and that opposing counsel had lied to his clients and was mentally incompetent, though we found those statements had no basis in fact or law and were frivolous. Yoder also sent letters to a disciplinary grievant and two potential witnesses—letters that were found to serve no substantial purpose other than to strike fear in, embarrass, or harass the recipients or burden them with the cost of hiring counsel to deal with his inappropriate threats and inuendo. Like Baker, Yoder maintained that everything he said was true, maintained that nearly everyone involved in the underlying litigation and in the disciplinary process had lied or was biased against him, and categorically denied that he had committed any ethical violations.

{¶ 101} In addition to finding that Yoder violated three of the five rules that Baker violated in this case—Prof.Cond.R. 3.1, 8.4(c), and 8.4(d)—we also found that he violated rules that prohibit a lawyer from (1) presenting, participating in presenting, or threatening to present professional-misconduct allegations solely to obtain an advantage in a civil matter, (2) using means in the representation of a

client that have no substantial purpose other than to embarrass, harass, delay, or burden a third person, (3) knowingly making a false statement of fact or law to a tribunal, (4) engaging in undignified or discourteous conduct that is degrading to a tribunal, and (5) knowingly making a false statement of material fact or law to a third person while representing a client. *Id*. at ¶ 17-18.

{¶ 102} Just four of the eight aggravating factors present in Baker's case were present in *Yoder*—Yoder engaged in a pattern of misconduct, committed multiple offenses, refused to acknowledge the wrongful nature of his misconduct, and harmed vulnerable victims, *id.* at ¶ 29. And compared to the single mitigating factor acknowledged in this case, two mitigating factors were present in *Yoder*—Yoder's clean disciplinary record and cooperation in the disciplinary proceedings, *id*. at ¶ 30. Although the board recommended that we impose a two-year suspension, with one year conditionally stayed for Yoder's misconduct, we suspended Yoder for two years with six months conditionally stayed. *Id.* at ¶ 41-42. We also conditioned Yoder's reinstatement on the submission of proof that he had completed an OLAP evaluation and complied with any recommendations arising from that evaluation. *Id*.

{¶ 103} Having considered Baker's misconduct in this case, the aggravating and mitigating factors present, and our precedent, we find that the appropriate sanction here is a two-year suspension, with the second year of that suspension stayed on the condition that she engage in no further misconduct. In addition to the requirements of Gov.Bar R. V(24), we agree that Baker's reinstatement to the practice of law must be subject to the additional requirements recommended by the board.

## V. CONCLUSION

{¶ 104} Accordingly, Christine Marie Baker is suspended from the practice of law in Ohio for two years, with one year stayed on the conditions that she refrain from further misconduct and pay the costs of these disciplinary proceedings. If

Baker fails to comply with any condition of the stay, the stay will be lifted and she will serve the full two-year suspension. In addition to the requirements for reinstatement set forth in Gov.Bar R. V(24), Baker shall be required to submit proof that she has (1) paid any monetary sanctions that may be ordered by the Montgomery County Court of Common Pleas in connection with case No. 2024-CV-05626, (2) completed six hours of CLE focused on legal ethics and professionalism in addition to the requirements of Gov.Bar R. X, (3) submitted to a mental-health evaluation conducted by OLAP after the issuance of the suspension order in this case, and (4) complied with all of OLAP's treatment recommendations. Costs are taxed to Baker.

Judgment accordingly.

_____

**DEWINE, J., concurring.**

{¶ 105} Christine Marie Baker engaged in reprehensible behavior in clear violation of our disciplinary rules. Thus, I join in the majority's decision suspending her from the practice of law.

{¶ 106} I write separately to address an issue that the majority skirts: the question whether all statements—including deliberate and malicious lies—are absolutely privileged when they are made in the context of an attorney-disciplinary proceeding. Applying a decision of this court, *Hecht v. Levin*, 1993-Ohio-110, the Board of Professional Conduct concluded that any statement made in an attorney-disciplinary proceeding is absolutely privileged. What this means is that someone can file a false claim of attorney misconduct, alleging the most atrocious misbehavior, and be completely free from any consequences, even when the person making the allegation knows with certainty that the claim is false.

{¶ 107} Not only is this absolute-immunity rule inequitable, it is also contrary to Ohio statute. R.C. 2305.28(D) provides a *qualified* privilege for statements made to attorney-disciplinary authorities. Under that statute, a person

who provides information to a professional standards review committee "without malice and in the reasonable belief that the information is warranted by the facts known to him" cannot be held "liable in damages in a civil action as a result of providing that information." R.C. 2305.28(D).

{¶ 108} Yet this court in *Hecht* decided to cast aside the statutory rule—and its requirements of a lack of malice and reasonable belief—and replace it with the court's own rule of absolute privilege. It's time that we revisit *Hecht* and follow the law that the General Assembly enacted.

## I. BACKGROUND

{¶ 109} One of the issues in this disciplinary proceeding involves lawsuits filed by Baker against Zachary Reynolds in retaliation for a grievance Reynolds filed with the Dayton Bar Association. In concluding that Baker committed disciplinary violations in connection with her lawsuits, the board relied partly on this court's decision in *Hecht*. The board found that Baker's defamation claim lacked a factual basis, the evidence did not support Baker's claims that Reynolds made knowingly false statements, and Baker filed her complaints knowing that such claims were nonetheless barred by *Hecht*. The board was particularly troubled that Baker pursued her lawsuits despite the absolute privilege for statements made in attorney disciplinary proceedings provided by *Hecht*. It opined that *Hecht* reinforced "important legal and policy considerations," including "the public policy need to maintain ethical standards in the legal profession through unencumbered reporting of misconduct."

{¶ 110} In her objections to the board's report and recommendation, Baker urges us to revisit our decision in *Hecht*, arguing that the absolute privilege for statements made in attorney-disciplinary proceedings "creates perverse incentives, allowing bad actors to weaponize the disciplinary system without consequence." Instead of an absolute privilege, Baker asks this court to follow a rule that would

allow attorneys to file "civil claims for malicious prosecution or abuse of process when a grievance is filed with malice and without probable cause."

## II. ANALYSIS

{¶ 111} The majority sidesteps the issue that Baker raises about the continuing viability of the absolute privilege for attorney-discipline grievances. It says that "because the record clearly and convincingly disproves Baker's claims that the allegations in Reynolds's grievance were dishonest or filed with malice, . . . [it] decline[s] to revisit our holding in *Hecht*." Majority opinion, ¶ 77. I agree with the majority that there is no evidence of malice or that Reynolds uttered any deliberate falsehoods. But I would resolve the immunity issue based on R.C. 2305.28(D) and make clear that a qualified privilege, not *Hecht*'s absolute privilege, applies to claims of privilege for statements made to disciplinary authorities.

### A. The Legislature Has Adopted a Qualified Privilege

{¶ 112} R.C. 2305.28(D) provides:

> No person who provides information to a . . . professional standards review committee . . . or to a member or employee of such a . . . professional standards review committee . . . without malice and in the reasonable belief that the information is warranted by the facts known to him is liable in damages in a civil action as a result of providing that information.

The provision explicitly applies to a professional standards review committee "of a state or local professional organization composed of . . . attorneys at law." R.C. 2305.28(B) and (D). Thus, under the plain terms of the statute, a person who files a grievance—or otherwise provides information—to a state or local bar association's attorney-disciplinary committee is entitled to a privilege for such

statements in a subsequent civil proceeding. That privilege is limited, however, to statements made "without malice and in the reasonable belief that the information is warranted by the facts known to" the person making the grievance. R.C. 2305.28(D). Applying a similar statutory provision, we have held that the malice standard that must be met to overcome a claim of qualified privilege is "actual malice," which we have defined as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity," *Jacobs v. Frank*, 60 Ohio St.3d 111, 116 (1991) (applying qualified immunity under former R.C. 2305.25).

{¶ 113} R.C. 2305.28(D) insulates Reynolds from liability for the statements contained in the grievance he filed with the Dayton Bar Association. As the majority correctly concludes, there is no evidence that the statements made in his grievance were dishonest (i.e., not based on a "reasonable belief . . . warranted by the facts") or made with malice. R.C. 2305.28(D). Thus, Reynolds could not be civilly liable for the statements he made in his grievance and it is appropriate to discipline Baker for her retaliatory and frivolous lawsuits.

## B. We Should Revisit *Hecht*

{¶ 114} My concern is that rather than rely on R.C. 2305.28(D)'s qualified privilege, the board looked to our decision in *Hecht*. In my view, that decision is seriously flawed and should be revisited.

{¶ 115} In *Hecht*, an attorney filed a defamation lawsuit against a person who had lodged a grievance against the attorney with the certified grievance committee of a local bar association. This court concluded that "[a] statement made in the course of an attorney disciplinary proceeding enjoys an absolute privilege against a civil action based thereon as long as the statement bears some reasonable relation to the proceeding." *Hecht*, 1993-Ohio-110, at paragraph two of the syllabus. In reaching this conclusion, the court extended the absolute privilege that

applies to statements made in judicial proceedings, *see Surace v. Wuliger*, 25 Ohio St.3d 229 (1986), syllabus, to statements made in grievances, *Hecht* at ¶ 12.

{¶ 116} The court acknowledged that R.C. 2305.28(D) "clearly creates a qualified privilege" that "[o]n its face . . . purports to apply to grievances filed against lawyers with local bar associations." *Id.* at ¶ 17. Nonetheless, the court refused to apply the statute to grievances filed against attorneys, opining that to do so "would render it unconstitutional." *Id.* at ¶ 19. The court stated that "[t]he Constitution of Ohio places the supervision of attorneys exclusively in the judicial branch" and "[a]ny [legislative] attempt to circumvent the procedures promulgated by the Supreme Court of Ohio pursuant to its constitutional mandate is an impermissible incursion into this court's plenary authority." *Id.*

{¶ 117} Two justices dissented, arguing that "reputation is a successful attorney's greatest asset" and "[t]o leave something of such value open to the prey of the malicious makes little sense." *Id.* at ¶ 23 (Pfeiffer, J., dissenting). The dissenting justices noted that Civ.R. 11 already subjects lawyers who engage in malicious and frivolous conduct to sanctions, and DR 7-102(A)(1) prohibited lawyers from filing groundless suits meant to harass or maliciously injure another. *Id.* at ¶ 25 (Pfeiffer, J., dissenting). "Extension of absolute immunity amounts to an unneeded, unconstitutional shield which obstructs the ability of an innocent, conscientious attorney to protect his or her reputation," the dissent concluded. *Id.* at ¶ 26 (Pfeiffer, J., dissenting).

{¶ 118} I have multiple concerns with the decision in *Hecht*. First, I am not persuaded by its conclusion that it would be unconstitutional to apply R.C. 2305.28(D) to attorney grievances. Second, *Hecht* applied dubious logic in extending the litigation privilege to grievance complaints. And finally, I am not convinced that the public policy concerns articulated by the *Hecht* court justify its rule of an absolute, rather than a qualified, privilege.

*1. R.C. 2305.28 Is Not Clearly Incompatible with This Court's Constitutional Authority over Attorney Discipline*

{¶ 119} Start with the *Hecht* court's determination to ignore the plain terms of R.C. 2305.28(D) on the basis that it would be unconstitutional to apply what "[o]n its face" the statute clearly said. Although the court failed to cite any provision of the Ohio Constitution to support its conclusion of unconstitutionality, it presumably was relying on Article IV, Section 2(B)(1)(g). That provision provides that "[t]he Supreme Court shall have original jurisdiction" concerning "[a]dmission to the practice of law, the discipline of persons so admitted, and all other matters relating to the practice of law."

{¶ 120} It is "only when . . . clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it." *Cincinnati, Wilmington & Zanesville RR. Co. v. Clinton Cty. Commrs.*, 1 Ohio St. 77, 82-83 (1852). So the only way we may refuse to apply R.C. 2305.28(D) is if it is clearly incompatible with the constitutional provision granting this court authority over attorney discipline.

{¶ 121} Nothing in R.C. 2305.28(D) regulates the discipline of attorneys. It does not purport to govern the conduct for which an attorney may be disciplined, the sanctions that may be levied for misconduct, or the procedures employed in attorney-disciplinary proceedings. Rather, its application relates solely to the standards for liability in civil lawsuits. So on plain reading, the statute presents no conflict with our constitutional authority over attorney discipline.

{¶ 122} It is true that R.C. 2305.28(D) might have a tangential impact on attorney-disciplinary proceedings. A qualified, rather than an absolute privilege, means that grievants who make knowingly false claims against an attorney may be held liable for defamation. Thus, replacing the absolute privilege with a qualified privilege could deter some grievances from being filed.

{¶ 123} But all kinds of laws tangentially impact areas that fall within our Article IV, Section 2(B)(1)(g) powers. We have upheld a statutory enactment that permitted a nonattorney corporate representative to file and present a claim in small claims court, notwithstanding this court's authority to regulate the practice of law. *See Cleveland Bar Assn. v. Pearlman*, 2005-Ohio-4107, syllabus. The General Assembly prescribes laws that establish the qualifications for service as a judge, including minimum time requirements for which a judicial candidate must have engaged in the practice of law in this State. *See, e.g.*, R.C. 1901.06. And notwithstanding our exclusive jurisdiction over the practice of law, we have held that county boards of elections may decide what the practice of law is for purposes of applying such statutes. *See State ex rel. Carr v. Cuyahoga Cty. Bd. of Elections*, 63 Ohio St.3d 136, 138 (1992), *superseded by statute on other grounds as stated in Whitman v. Hamilton Cty. Bd. of Elections*, 2002-Ohio-5923, ¶ 21.

{¶ 124} In short, R.C. 2305.28 is like a lot of laws that have a tangential impact on things that fall within this court's authority under Article IV, Section 2(B)(1)(g). Because nothing about R.C. 2305.28(D) is "clearly incompatible" with the Ohio Constitution, *Hecht* was wrong to conclude that it would be unconstitutional to follow the plain terms of the statute.

*2.* Hecht *Employed Dubious Logic in Extending the Litigation Privilege to Attorney Grievances*

{¶ 125} In adopting its rule of absolute privilege for attorney grievances, the *Hecht* court looked to the litigation privilege that has long applied to statements made in judicial proceedings, explaining that a "statement made in a judicial proceeding enjoys an absolute privilege against a defamation action as long as the allegedly defamatory statement is reasonably related to the proceeding in which it appears." 1993-Ohio-110, at ¶ 7, citing *Surace*, 25 Ohio St.3d 229, at syllabus. In doing so, however, the court ignored important differences between attorney grievances and judicial proceedings.

{¶ 126} We first recognized the litigation privilege in *Erie Cty. Farmers' Ins. Co. v. Crecelius*, 122 Ohio St. 210 (1930). We stated that the "rule is grounded upon public policy" and acknowledged that "it may in some instances afford immunity to the evil disposed and the malignant slanderer." *Id.* at 215. But we concluded that such concerns were tempered by other institutional mechanisms that may be employed in the context of litigation, including that witnesses who offer perjured testimony could be prosecuted, that those "who transgress the proprieties without justification" could be held in contempt, and the availability of claims for abuse of process. *Id.* In *Surace*, we further explained that "'sufficient protection from gross abuse of the privilege is provided by the fact that an objective judge conducts the judicial proceedings and that the judge may hold an attorney in contempt if his conduct exceeds the bound of legal propriety or may strike irrelevant, slanderous or libelous matter.'" *Surace* at 234, quoting *Justice v. Mowery*, 69 Ohio App.2d 75, 77 (10th Dist. 1980).

{¶ 127} Thus, central to the absolute litigation privilege is the ability of a trial judge to manage the litigation process and the existence of other remedies to deter intentionally false misstatements. What the *Hecht* court overlooked is that these same considerations do not apply in the context of an attorney grievance. There is no impartial judge who oversees the filing of attorney grievances. Nor is there any ability to hold a person filing an attorney grievance in contempt.

{¶ 128} What is more, the most basic protection against the filing of frivolous complaints in a civil lawsuit—Civ.R. 11—does not apply to attorney grievances. Under Civ.R. 11, an attorney or unrepresented party who signs a pleading, motion, or other document certifies that to "the best of the attorney's or party's knowledge, information, and belief there is good ground to support it." Violation of the rule subjects the signer to sanctions, and "[s]imilar action may be taken if scandalous or indecent matter is inserted." *Id.* Civ.R. 11 applies to "all courts of this state," Civ.R. 1(A). And while our Rules for the Government of the

Bar require the board and hearing panels to follow the Civil Rules when practicable, *see* Gov.Bar R. V(27)(A), nothing in our Rules extends Civ.R. 11 to a person who files a grievance.

{¶ 129} The point is that a rule of absolute privilege may make sense in the context of litigation where a trial judge can manage the proceedings and other means exist to deal with deliberate misstatements. The same considerations do not apply to attorney grievances.

### 3. Hecht's Public Policy Rationales Are Unconvincing

{¶ 130} As I have explained, the *Hecht* decision is jurisprudentially unconvincing both in its failure to follow R.C. 2305.28(D) and its equating of an attorney grievance with a judicial proceeding. That's not surprising: the opinion was grounded more in the court's notion of what made good public policy, rather than legal doctrine. But even on policy grounds, its logic is unconvincing.

{¶ 131} *Hecht* declared that an absolute privilege was good "[p]ublic policy," whereas "[a] qualified privilege would open the door to retaliatory suits" such that even defamation claims made in bad faith would force "the expense, effort and emotional anguish of defending suit." 1993-Ohio-110 at ¶ 13. The court found it significant that "[a] grievance is kept private until a panel of the board makes a finding of probable cause and certifies it to the board" and opined that the disciplinary "procedures assure that clearly frivolous complaints are summarily dismissed, with little emotional, professional, or financial toll on the subject of the complaint." *Id.*

{¶ 132} It is, of course, true that frivolous lawsuits can create expense and cause emotional anguish. But the same is true for deliberately false attorney grievances. An attorney who is forced to defend against a false charge may endure expense, embarrassment, and emotional anguish in much the same way as someone who is wrongfully subjected to a defamation case. In enacting R.C. 2305.28(D), the legislature sought to balance these concerns, creating a privilege for statements

made without malice and in reasonable belief on known facts, but withholding the privilege from malicious falsehoods.

**{¶ 133}** The *Hecht* court relied on the fact that our rules require investigators to keep attorney-disciplinary proceedings confidential prior to a determination of probable cause. Gov.Bar. R. V(8)(A)(1). But nothing in those rules prevents a complaining party from publicizing a grievance. And in an era that has seen an increased weaponization of the disciplinary process, it is not uncommon for grievances to be publicized before any finding of probable cause.[4] Yet the *Hecht* absolute privilege rule applies equally to grievances that are kept confidential and to those that are shared with the press.

**{¶ 134}** As far as *Hecht*'s concern about deterring attorneys from filing frivolous retaliatory lawsuits, I am not convinced that an absolute privilege has a significantly greater deterrent effect than a qualified privilege would. For the conscientious attorney, cognizant of his ethical obligations and mindful of his ultimate chance of success in court, both an absolute privilege and a qualified privilege will serve equally to deter frivolous, retaliatory lawsuits. But for the unscrupulous attorney, who simply wants to harass a grievant even though he knows the grievance will be ultimately dismissed, neither type of privilege— absolute or qualified—will prevent such misconduct. After all, Ohio's absolute privilege did not stop Baker from filing her lawsuit. And it has not deterred other

---

4. *See, e.g.*, Dean Narciso, *Ohio Attorney Investigated for Adding Himself, Family Members to Clients' Wills*, Columbus Dispatch (Sept. 8, 2023), https://www.dispatch.com/story/news /local/2023/09/08/attorney-john-mashburn-named-as-beneficiary-in-clients-wills/70737468007/ (accessed May 11, 2026) [https://perma.cc/8C7T-CG6R]; Associated Press, *Watchdog Group Files Ethics Complaint over Seitz Probe* (June 22, 2018), https://www.wcpo.com/news/government/state-government/watchdog-group-files-ethics-complaint-over-seitz-probe (accessed May 11, 2026) [https://perma.cc/KES5-AX5Z]; Martha Neil, *Judge Faces Ethics Investigation over Prosecutor's Viewing of Live Courtroom Feed*, ABA Journal (Oct. 31, 2014) https://www.abajournal.com /news/article/judge_faces_discipline_case_over_prosecutors_viewing_of_live_feed_from_cour (accessed May 11, 2026) [https://perma.cc/C88G-68LM] (describing grievance filed against judge and the "confidential nature of the investigation"); *see generally* The 65 Project, *Ethics Complaints*, https://the65project.com/ethics-complaints/ (accessed May 11, 2026) [https://perma.cc/3J37-ENEU] (providing copies of disciplinary grievances filed nationwide).

attorneys from filing such retaliatory lawsuits. *See* majority opinion at ¶ 95 (collecting cases).

{¶ 135} On that point, our rules and laws provide a more direct—and more targeted—means to deter and deal with frivolous and retaliatory lawsuits. It is a violation of the Rules of Professional Conduct for an attorney to "bring or defend a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous." Prof.Cond.R. 3.1. Sanctions under Civ.R. 11 may be imposed against an attorney who willfully signs a pleading without a good-faith belief that there is "good ground to support it." And R.C. 2323.51 provides for an award of attorney's fees for litigation conduct that "serves merely to harass or maliciously injure another party" or that is done "for another improper purpose." The provision further makes sanctionable claims that are "not warranted under existing law" or by a good faith argument for an extension thereof, as well as "allegations or other factual contentions that have no evidentiary support." *Id.*

{¶ 136} These rules and laws provide a far more potent means to deter frivolous, retaliatory lawsuits than the absolute privilege created in *Hecht*. And unlike the absolute privilege, these measures distinguish between what is frivolous and retaliatory, and what has a reasonable basis in law and fact.

{¶ 137} Nor is there a convincing policy reason to distinguish between frivolous claims that arise from the attorney-disciplinary process and claims filed by other professionals arising from similar disciplinary processes. The *Hecht* decision left in place R.C. 2305.28(D) as it applies to "doctors of chiropractic, doctors of veterinary medicine, . . . real estate brokers, architects, professional engineers, certified public accountants, public accountants, or registered nurses," R.C. 2305.28(B). Two years before *Hecht*, we relied on a similar statute, former R.C. 2305.25 (now R.C. 2305.251, *see* Sub.S.B. No. 179, 149 Ohio Laws, Part II, 3596) to conclude that a qualified privilege applies to complaints about doctors and other healthcare professionals. *See Jacobs*, 60 Ohio St.3d at 113-114. In doing so,

we opined that "[p]ublic policy concerns dictate that those who provide information to licensing boards pursuant to [former] R.C. 2305.25 be given a qualified privilege in order to aid in the dissemination of information to those boards, thereby improving the quality of health care administered to the general public." *Id.* at paragraph one of the syllabus. I fail to see a good policy rationale for treating lawyers differently than doctors, engineers, accountants, and other professionals.

{¶ 138} In any case, the responsibility of creating public policy rests with the General Assembly, not this court. *See* Ohio Const., art. II, § 1. "While it is our duty to independently interpret the Ohio Constitution and to enforce its guarantees, we should not treat this responsibility as license to impose policy preferences unconnected with text and tradition." *State v. Aalim*, 2017-Ohio-2956, ¶ 48 (DeWine, J., concurring). The General Assembly has balanced the competing interests and made the determination that it would be better to have a qualified—rather than an absolute—privilege for those testifying in attorney-disciplinary proceedings. *See* R.C. 2305.28. We should not supplant that determination simply because we might balance the interests differently.

### III.  CONCLUSION

{¶ 139} In my view, *Hecht* was wrongly decided and we should revisit that decision in an appropriate case. In this case, however, even under a qualified privilege standard, Baker violated Prof.Cond.R. 3.1 by pursuing her retaliatory and meritless lawsuits. I also agree with the majority in its determination of Baker's other rule violations and in the sanction that it imposes. Thus, I concur in the majority's opinion and the court's judgment.

————————————

Roderer Law Office, L.L.C., and Paul B. Roderer Jr., for relator.

Christine Marie Baker, pro se.

————————————